MIRARIS RUTH PAZ - March 19, 2010

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION

 3   PABLO PAZ, INDIVIDUALLY  )
     AND A/N/F JANE DOE, A    )
 4   MINOR, AND RUTH PAZ,     )
                              )
 5   VS.                      ) CIVIL ACTION
                              )
 6                            ) NO.: 4:09-CV-2804
     LIFE TIME FITNESS, INC., )
 7   LTF CMBS 1, LLC, LTF CLUB)
     MANAGEMENT COMPANY, LLC, )
 8   LTF CLUB OPERATIONS      )
     COMPANY, INC. And GENE   )
 9   SMITH                    )

10

11   ----------------------------------

12        ORAL AND VIDEOTAPED DEPOSITION OF

13              MIRARIS RUTH PAZ

14               MARCH 19, 2010

15                 Volume 1

16   ----------------------------------

17

18
         ORAL AND VIDEOTAPED DEPOSITION OF MIRARIS RUTH PAZ,
19  produced as a witness at the instance of the Defendants,
    and duly sworn, was taken in the above-styled and
20  numbered cause on the 19th of March, 2010, from 1:42
    p.m. to 2:30 p.m., before Kevin J. Bruzewski, CSR in and
21  for the State of Texas, reported by machine shorthand,
    at the law offices of The Callahan Law Firm, 440
22  Louisiana, 440 Louisiana, Suite 2000, Houston, Texas
    77002, pursuant to the Federal Rules of Civil Procedure
23  and the provisions stated on the record or attached
    hereto.
24

25
```

Page 2

```
 1           APPEARANCES
 2
 3   FOR THE PLAINTIFFS:
 4     MR. CASEY BROWN
       The Callahan Law Firm
 5     440 Louisiana, Suite 2000
       Houston, Texas  77002
 6
     FOR THE DEFENDANTS LIFE TIME FITNESS, INC., LTF CMBS 1,
 7   LLC, LTF CLUB MANAGEMENT COMPANY, LLC, LTF CLUB
     OPERATIONS COMPANY, INC. And GENE SMITH:
 8
       MR. MARC A. SHEINESS
 9     Sheiness, Scott, Grossman & Cohn, LLP
       1001 McKinney, Suite 1400
10     Houston, Texas  77002-6323
       713.374.7005
11
     ALSO PRESENT:
12     Mr. Pablo Paz
```

Page 3

INDEX
                                                    PAGE
Appearances....................................... 2
Stipulations..................................... 4
MIRARIS RUTH PAZ
    Examination by Mr. Sheiness................. 4

Signature and Changes............................39

Reporter's Certificate...........................40

EXHIBITS

NO.  DESCRIPTION                                 PAGE

1   Copy of Participation Agreement              21


REQUESTED ITEMS

NO.  DESCRIPTION                                 PAGE

1   All right. And now, so I'm going to          27
request the date of starting the Kids College
2   And I request her number (Becky McKay)       40

Page 4

                PROCEEDINGS

        VIDEOGRAPHER: We're on the record.
Today's date is Friday, March the 19th, year 2010. The
time is 1:42 p.m.
        COURT REPORTER: Stipulations for the
record?
        MR. SHEINESS: You want her to read and
sign?
        MR. BROWN: Yeah.

              **********

        MIRARIS RUTH PAZ, witness,
having been first duly sworn, testified as follows,
to-wit:
              EXAMINATION
BY MR. SHEINESS:
    Q. Would you please state your full name for the
record, please, ma'am?
    A. Miraris Ruth Paz.
    Q. Ms. Paz, you sat here while I took the
deposition your daughter?
    A. Yes, I did.
    Q. Okay. You understand what a deposition is?
    A. Yes, I do.
    Q. I want you to listen to my questions. I'm not

RESOURCE REPORTING SERVICE
(713) 626-2629

EXHIBIT A

5687e685-2667-4939-ab99-38f481cafa62

MIRARIS RUTH PAZ - March 19, 2010

Page 5

1  going to ask that many, but if you don't understand my
2  question, then don't answer it. Tell me you don't
3  understand it and I'll repeat it as many times as
4  necessary until we get it straight; okay?
5      A. Okay.
6      Q. Okay. Have you ever given your deposition
7  testimony before?
8      A. No.
9      Q. The medical bills that have been incurred by
10 your daughter --
11     A. Uh-huh.
12     Q. -- who has paid them?
13     A. We have.
14     Q. Did the facility Life Time have -- did you turn
15 any bills into them?
16     A. No, we haven't.
17     Q. Were you told not to, told you could or just
18 never did?
19     A. Never did.
20     Q. Okay. When you say we have paid them, what do
21 you mean by that?
22     A. My husband and I and the insurance company.
23     Q. Okay. On the medical bills, have you and your
24 husband outlaid any actual cash yourselves?
25     A. Yes.

Page 6

1      Q. Is that the co-pay?
2      A. The co-pay and coinsurance and deductible.
3      Q. Okay. If you had to estimate your deductible
4  and your co-pays, all the payments, what number would
5  you guesstimate you've paid?
6      A. I have no idea.
7      Q. Okay. Whose insurance are we charging all
8  these bills to?
9      A. Aetna.
10     Q. Aetna.
11         Okay. And do you have with you the card,
12 the insurance card?
13     A. Yes, I do.
14     Q. Would you hand that to me?
15     A. It's in my purse.
16     Q. Okay. See, your husband is like me, never go
17 into a woman's purse. Never.
18     A. (Tendering).
19     Q. Thank you, ma'am. I tell you what, I'm going
20 to ask Casey.
21         MR. SHEINESS: If you don't mind, if you
22 would just make a copy of this. I will not attach it as
23 an exhibit, but I don't have to write it all down and so
24 I can order the records or bills from this if you
25 will --

Page 7

1          MR. BROWN: That's fine.
2          MR. SHEINESS: -- make a copy.
3          MR. BROWN: Do you want to take a break
4  or can we do it --
5          MR. SHEINESS: No, just later.
6          MR. BROWN: Okay.
7  BY MR. SHEINESS:
8      Q. Okay. I was going to ask y'all that, but we
9  don't need it on the record so. I don't know who reads
10 these things anyway any more but...
11         But you have a deductible.
12         MR. SHEINESS: Does it show a deductible on
13 there? Sometimes they do.
14 BY MR. SHEINESS:
15     Q. Well, no.
16         Okay. The medical records that I have on
17 your daughter --
18     A. Uh-huh.
19     Q. -- the last medical record I have is Dr. Brock,
20 November of '09.
21     A. Uh-huh.
22     Q. Has she been back to see him since then?
23     A. No.
24     Q. Okay. I see where in November 8th of '09 she
25 had to go see the nurse at the school for laceration or

Page 8

1  abrasion as a result of trauma.
2          Were you aware of that?
3      A. No.
4      Q. Okay. I did not bring the actual record, I
5  just brought my summary. But I know it's typically the
6  policy of most schools that if you have -- a child has
7  to visit the nurse, then the mother, the parents are
8  supposed to know about it. I didn't --
9      A. Right.
10     Q. And I'm not trying to blame anybody, I just
11 want to know. Do you know anything about that
12 particular event? That's all I know or at least I
13 didn't bring the records.
14         See where I've got it circled?
15     A. Yeah.
16     Q. November of '09.
17         MR. BROWN: It's actually December, Marc.
18         MR. SHEINESS: I said that. November last
19 saw the doctor. December --
20         MR. BROWN: Okay.
21         MR. SHEINESS: You're right. December.
22 BY MR. SHEINESS:
23     Q. Whatever date is there, you don't recall being
24 told about going there?
25     A. No.

MIRARIS RUTH PAZ - March 19, 2010

Page 9

1  Q. I also have February of this year, the last
2  record I have from the school, another visit to the
3  nurse.
4      Are you aware of that one?
5  A. Yes, I am.
6  Q. Okay. Do you know if she has been to see any
7  health care provider at the school, anywhere for a
8  traumatic event since December of '08 of '09 -- of '09?
9  A. I took her to the pediatrician for a bladder
10 infection.
11 Q. Okay. And who is the name of the pediatrician?
12 A. Deborah Bootin.
13 Q. Can you can you spell the last name?
14 A. B-O-O-T-I-N.
15 Q. And what, Sugar Land, Houston?
16 A. Medical center.
17 Q. Medical center.
18     When was this?
19 A. That was the day on that --
20 Q. Oh.
21 A. That same day.
22 Q. February 5th of '10?
23 A. Yes.
24 Q. Okay. Has she seen -- who is her primary care
25 physician?

Page 10

1  A. Dr. Bootin.
2  Q. Okay. And so for the last two or three years
3  for anything you've had to have her seen somebody, it's
4  either Dr. Bootin --
5  A. Uh-huh.
6  Q. -- or the orthopedic doctor?
7  A. The orthopedic doctor and then there is some
8  other doctors that she's also seen.
9  Q. Who else? Dr. Brock, Dr. Bootin and who else?
10     Now, are you talking about other doctors at
11 Fondren or other doctors somewhere else?
12 A. Somewhere else.
13 Q. All right. Tell me what other doctors she's
14 seen in the last couple years and for what reason?
15 A. There's a clinic. I don't know the name. It's
16 called Medi Clinic. I don't know the doctor's name.
17 He's a -- starts with a "G," but we've seen him for like
18 allergies and sore throat, things like that.
19 Q. Okay. And would you be able to find out within
20 the next few days --
21 A. Oh, yes.
22 Q. -- the name of the clinic?
23 A. Uh-huh.
24 Q. Let me get the whole question in.
25     The name of the clinic and address?

Page 11

1      Is that one of these Medi center clinics?
2  A. Yes. It's closer to the house.
3  Q. Okay. There's a whole group of them around
4  town?
5  A. Right.
6  Q. Okay.
7  A. It's called Medi Clinic on Highway 6.
8  Q. Oh, okay.
9      Any other doctors she's seen other than
10 Dr. Brock, Dr. Bootin and the doctors at the medical
11 clinic that you can think of other than dentist?
12 A. Dentist?
13 Q. Other than a dentist.
14 A. Other than a dentist.
15 Q. In the last -- since the accident?
16 A. We've seen two other doctors. Before the
17 surgery, I wanted to get a second opinion so I got two
18 extra opinions -- two opinions from other doctors.
19 Q. Who were they?
20 A. I don't have their name.
21 Q. I might.
22 A. Dr. --
23 Q. One was at -- never mind. One was Antekeier,
24 A-N-T-E-K-E-I-E-R?
25 A. Yes.

Page 12

1  Q. Okay.
2  A. He's a pediatric orthopedic.
3  Q. Right.
4  A. And I wanted to go somewhere outside the
5  medical center area.
6  Q. You went to Texas Childrens?
7  A. Texas Children, right.
8  Q. Okay.
9  A. And I wanted to get his opinion based on the
10 MRI and everything before we did anything.
11 Q. And he wrote a report, I think?
12 A. Yes, he did.
13 Q. I've seen it.
14     Okay. Is there still another doctor?
15 A. There was another doctor. I don't remember his
16 name.
17 Q. All right. We're going to -- if you think
18 about it or I'll write Casey.
19 A. Okay.
20 Q. -- and ask if you can come up with his name.
21     And was that before the surgery as well?
22 A. Before the surgery.
23 Q. Okay.
24 A. And actually I took her right after Dr. Brock
25 took her off the -- took the cast off just for a second

MIRARIS RUTH PAZ - March 19, 2010

Page 13

1 opinion to make sure that everything was okay and just
2 to get a second opinion. That was it.
3     Q. Okay. Now, so all the medical bills have been
4 paid by Aetna minus deductible and co-pay and they have
5 been paid up to date?
6     A. Yes.
7     Q. As far as you know?
8     A. Yes, as far as I know.
9     Q. No one has been hounding you on any outstanding
10 medical bills?
11     A. I don't believe so.
12     Q. Okay.
13     A. I don't pay the bills.
14     Q. I need to ask the boss man here, Petron?
15     A. Uh-huh.
16     Q. You heard your daughter describe the fact that
17 unless she's been asked to run in a game, she's able to
18 get along without pain.
19         Is that your same understanding and belief
20 for let's say the last -- since September of last year
21 or no?
22     A. She does complain sometimes of pain in her leg
23 and she has to take some Advil. But it's usually after
24 some sort of activity.
25     Q. If I was a relative of yours staying in your

Page 14

1 house and had not seen your daughter in four or five
2 years and stayed a weekend and a day in a house and
3 whatever y'all do during, you know, a weekend.
4     A. Uh-huh.
5     Q. Would it be your belief that I as a relative
6 would leave there not even knowing she has ever
7 sustained a broken leg?
8     A. You would notice.
9     Q. What would I notice?
10     A. Her limping.
11     Q. Okay. Limping all the time, some of the time?
12     A. Some of the time.
13     Q. When do you see as a mother her limping more or
14 the times? Is there a common denominator, end of the
15 day, beginning of the day, after activities?
16     A. Anytime that she goes a little bit faster than
17 just walking.
18     Q. Okay. Tell me an example what you -- when I
19 might see that.
20     A. When she goes from the kitchen to answer the
21 door or the hallway, you see her running down the
22 hallway.
23     Q. Then would she limp after she opens the front
24 door and greets somebody for a period of time or is she
25 limping as she gets to the front door?

Page 15

1     A. She's limping as she's getting to the front
2 door.
3     Q. Okay. Once she gets to the front door in your
4 example, and I like it, and she greets the people and
5 they're coming in the house and she's no longer walking
6 fast, she's not limping?
7     A. If she's walking normal, no.
8     Q. Have y'all had to have any orthotics put in?
9     A. No.
10     Q. Okay. Can you think of any other examples
11 other than going to the front door? I mean, if she --
12 if she's going up to her bedroom to get something that
13 she needs for downstairs and she comes back downstairs,
14 can she bound down the stairs as a child might -- is
15 that right, bound downstairs?
16     A. Run down the stairs, yes, but you see her --
17     Q. Favoring?
18     A. Favoring -- she basically holds onto the rail
19 and puts more weight on that side and leaving her leg
20 like breaking her drop.
21     Q. Okay. But could I go a day in the house or two
22 days without seeing that? Just --
23     A. No, you would see it.
24     Q. It's almost every day?
25     A. It's every day.

Page 16

1     Q. Okay. The Advil is just over the counter
2 Advil?
3     A. Uh-huh.
4     Q. Is that a "yes"?
5     A. Yes. Sorry.
6     Q. What did the doctor tell you the last time you
7 saw him in November of '09?
8     A. That we discussed starting her on games and he
9 said that -- like soccer, because I wanted to get her
10 back into some sort of activity. And he told me not to
11 do anything until just wait for the summer. Or I
12 believe he said just hold off on everything right now
13 until her bone healed.
14     Q. Okay. And did he ask y'all to see that she
15 does stretching exercises?
16     A. Yes.
17     Q. And is she doing that?
18     A. Yes, she is.
19     Q. What type of stretching exercise is she doing?
20     A. She -- she lays down on the bed and she lifts
21 up her -- I put pressure on her foot and she bends it up
22 and down, up and down.
23     Q. Okay. Is that what he showed y'all to do?
24     A. Uh-huh.
25     Q. Okay.

MIRARIS RUTH PAZ - March 19, 2010

Page 17

1     MR. BROWN: Is that a "yes"?
2     A. Yes. And he also basically said for her to
3  ride her bike, some activity with a bike.
4  BY MR. SHEINESS:
5     Q. Okay. And is she doing that?
6     A. Yes.
7     Q. Where does she ride the bike?
8     A. Around the neighborhood, but not very often.
9     Q. Is it because of the weather or just, you know,
10 the area? Why is she not doing it more?
11    A. The weather.
12    Q. Okay.
13    A. The weather and if it's a school -- I don't
14 want her to -- it's a school day or anything like that,
15 she can do this on the weekends but I don't want her to
16 affect it not going to school the next day because of
17 her leg hurting.
18    Q. Okay. Has she been riding on weekends as best
19 you can let her do it?
20    A. Not often. But we did get a stationary remote
21 thing that she can just do that activity at home. And
22 she has it in her room.
23    Q. Okay. Is it a stationary bike or --
24    A. It's just the pedals.
25    Q. Just the pedals?

Page 18

1     A. Uh-huh.
2     Q. Okay. Yeah.
3        What do -- did the doctor in November
4  of '09 say come back May or June or just say come back
5  if you need to, what was his parting remarks?
6     A. He basically wanted us to follow up. And I
7  need to make another appointment.
8     Q. Okay. And when you left in '09, did he say
9  when or just say come back in the spring or do you
10 recall what his words were as he left?
11    A. I don't recall.
12    Q. Okay. What do you think he had hopefully
13 anticipated finding from what he said in '09 when you
14 come back this spring?
15    A. That he's hoping to find?
16    Q. Uh-huh.
17    A. That her leg is growing normal.
18    Q. Okay.
19    A. And the growth plate is not -- the growth plate
20 -- the spur in the growth plate is not affecting the
21 growth of the leg.
22    Q. Okay. When you see her limping, and I know
23 you're not a medical provider, but do you -- is it to
24 you from your viewpoint more favoring the knee or one
25 leg is shorter than the other, if you know?

Page 19

1     A. I don't know.
2     Q. Okay. Were any measurements ever taken?
3     A. Yes.
4     Q. And what -- how many different times were
5  measurements taken, do you recall?
6     A. I believe two or three.
7     Q. Okay. And as far as you know, they were equal
8  at the time?
9     A. No.
10    Q. Were they ever equal or were they always
11 different?
12    A. They were -- I don't know.
13    Q. Okay. But Dr. Brock did those?
14    A. Yes.
15    Q. Okay. Is her reading caught up, by the way?
16    A. Yes.
17    Q. She was behind in reading.
18       Oh, yeah. Dr. Deborah Bootin at 7400
19 Fannin, Suite 900, Houston.
20    A. Uh-huh.
21    Q. We've ordered those records.
22       Now, you handed me an Aetna, but somebody
23 wrote down United Healthcare.
24    A. That was before then.
25    Q. Okay. So for this accident, though, it was all

Page 20

1 Aetna?
2     A. No. No. My job changed insurances.
3     Q. Oh, okay.
4     A. So it could be that that was -- yeah. It was a
5  couple of years ago.
6     Q. All right.
7     A. I think it was with my husband's other
8  employer.
9     Q. All right. So I would have to obtain the
10 records from both United -- for this accident, if I
11 wanted to get all the medical bills incurred since --
12    A. August '08.
13    Q. -- August '08, I would need both United
14 Healthcare as well as the Aetna?
15    A. Right.
16    Q. Okay. What made you decide to sign up for Life
17 Time Fitness for your daughter?
18    A. I saw that -- I saw research regarding more
19 activity for kids and it looked like a fun thing for
20 summer.
21    Q. Okay. Did any of your other friends have their
22 daughters enrolled?
23    A. No. I didn't know anybody. I just Googled it
24 and I saw that it had child care and it seemed very nice
25 and safe.

## MIRARIS RUTH PAZ - March 19, 2010

Page 21

1  Q. Okay. And is that a true and correct
2  participation agreement filled out by you and signed by
3  you on behalf of Cristiana?
4  A. I believe so.
5  Q. Is that your signature on the second page?
6  A. Yes, sir.
7  Q. Let me mark that as Exhibit A.
8       COURT REPORTER: 1.
9       MR. SHEINESS: Exhibit 1.
10      (Exhibit No. 1 marked.)
11 BY MR. SHEINESS:
12 Q. When you -- when you filled that out, do you
13 recall where you were? Were you there or did you take a
14 package home to sign?
15 A. I was right there.
16 Q. Okay. Had you ever signed such an agreement
17 before for your child, any other child, yourself,
18 anywhere else to your knowledge?
19      Was this the first time you had signed such
20 an agreement?
21 A. The first I've signed an agreement like this.
22 Q. Do you feel now that you looking back you were
23 rushed or forced to sign this agreement?
24 A. I was in a rush, yes.
25 Q. Okay. Could you have taken this home and read

Page 22

1  it and brought it back the next day with your child the
2  next day?
3  A. I was dropping her off that day. I could not
4  do that.
5  Q. But that was your choice to drop her off that
6  day? Was there a day that had to be that day?
7  A. Well, it was either that day or I would have to
8  not put her in there that day.
9  Q. Okay. It was a start of a class?
10 A. Right.
11 Q. Okay. And how many days before this June 16th
12 had you Googled them and saw what classes they had for
13 your daughter?
14 A. No. It was just to leave her there for day
15 care.
16 Q. I understand that.
17      But from the time you decided to go and --
18 go to Life Time Fitness and enroll your daughter, how
19 many days from the day you actually arrived there to get
20 that done.
21 A. Oh, I don't remember.
22 Q. I mean, more than just a day?
23 A. Yes.
24 Q. Okay. Did you ever visit Life Time Fitness
25 center before you dropped her off?

Page 23

1  A. Yes, I did.
2  Q. How many different times did you go?
3  A. Just one time.
4  Q. And tell me what happened when you went by
5  there.
6  A. I saw the people, checked in. I talked to the
7  lady responsible for enrolling the children. They
8  showed me around as far as the rock climbing. They
9  showed me where she was going to be at in the gym and
10 the changing room. And then they let me know that they
11 were going to be going out to the pool.
12 Q. Okay. Did you have the opportunity if you
13 wanted to tour the whole facility or more than the
14 facility that was shown you?
15 A. They didn't mention it, but I assume they would
16 have.
17 Q. Okay. Approximately how long were you out
18 there that day?
19 A. I don't remember.
20 Q. Was Cristiana (sic) with you?
21 A. No.
22 Q. Okay.
23 A. Cristina.
24 Q. Cristina. I apologize.
25      Was your husband with you?

Page 24

1  A. No.
2  Q. Okay. How many other documents did you have,
3  if you recall, to sign other than the participation
4  agreement?
5  A. I don't remember.
6  Q. Is it going to be your position that you didn't
7  get a chance to read it, you didn't understand it all,
8  you were forced to sign it or anything like that?
9  A. Well, I didn't read it. I just signed it.
10 Q. Okay. Did you not read it because you needed
11 to get on to work or what?
12 A. I didn't read it because the place looked very
13 nice. Everything looked fine. I thought this was a
14 regular agreement that, you know, I will be responsible
15 if anything would happen to Cristina. But I did not
16 think that it was not going to be because it was not
17 safe.
18 Q. I understand that.
19      And although you had not ever signed one
20 like this before for any other child, the fact that you
21 were asked to sign it didn't surprise you, did it, in
22 today's world --
23 A. No. No, it didn't.
24 Q. -- or shock you in any way?
25 A. It didn't.

MIRARIS RUTH PAZ - March 19, 2010

Page 25

1   Q. Okay. And she got hurt on the first day she
2 was there?
3   A. No.
4   Q. Okay. How many days was it, had she been going
5 there?
6   A. She had been there since June -- I mean, school
7 ended which I believe this was like --
8   Q. June --
9   A. -- 16, '08.
10   Q. Right. So she had been going from June until
11 August 8th?
12   A. No.
13   Q. No.
14      All right. Tell me -- you sign her on
15 June 16th.
16   A. Uh-huh.
17   Q. You let her off?
18   A. She signed on June 16th, and I don't have all
19 that paperwork, but then I put her in another facility.
20 It's called Kid College. And she went there for about
21 two weeks. It was strictly school type of setting. And
22 then I brought her back to Life Time Fitness.
23   Q. Okay. Now, how long was she at Life Time
24 Fitness the first time?
25   A. The very first time?

Page 26

1   Q. Uh-huh.
2   A. I don't recall.
3   Q. Was she enrolled the first time in a particular
4 type of class that lasted a particular length of time?
5   A. No. It was just a --
6   Q. Oh, day care.
7   A. Day care.
8   Q. Okay. First time is day care, but she would be
9 using the pool?
10   A. Yes. It was -- it was a summer thing. It was
11 open for the summer for the kids when they were out of
12 school.
13   Q. And how long do you think you had her before
14 you took her to the other place?
15   A. I don't remember.
16   Q. All right. But would it be every weekday?
17   A. I think it was about -- I don't remember.
18   Q. Do you have any documents that might help you?
19   A. Yes, I can. I can get you that.
20   Q. All right. Tell me what you're thinking in
21 your mind that you have at your house. What type of
22 documents?
23   A. I can get -- actually I can call Kid College
24 and see when I enrolled her in that and that was for
25 strictly two weeks.

Page 27

1   Q. Okay. So we'll have to go -- I have to find
2 somebody who is capable from now. Good help is just so
3 hard to find.
4      So we have to go from June 16th until
5 whatever day you enrolled her at Kids College?
6   A. Uh-huh.
7   Q. And then for two weeks at Kids College;
8 correct?
9   A. Right.
10      MR. SHEINESS: All right. And now, so I'm
11 going to request the date of starting the Kids College.
12 BY MR. SHEINESS:
13   Q. Now, let's just for our discussion day say it
14 was a week.
15   A. Uh-huh.
16   Q. She was at Life Time day care for a week and
17 then you put her in Kids College for two weeks.
18      During that week, would it be every weekday
19 that you would take her --
20   A. Yes.
21   Q. -- and drop her off?
22   A. Yes.
23   Q. Okay. And as far as you know, in -- from
24 June 16th was -- assuming the weather was okay, was
25 swimming a part of the day?

Page 28

1   A. Yes.
2   Q. And did she keep a bathing suit or did she take
3 one with her each day?
4   A. Each day she would take one.
5   Q. Okay. And as far as you know now, being around
6 that pool, being around the grate, she was around it
7 virtually every day for some period of time before you
8 took her to Kids College?
9   A. Uh-huh.
10   Q. Is that a "yes"?
11   A. Yes. I'm sorry.
12   Q. Kids College had no pool, no outside
13 activities?
14   A. No.
15   Q. Correct?
16   A. Correct.
17   Q. All right. Now, she's through there.
18      Now, you bring her back and at what -- do
19 you bring her back for a particular class or is it
20 different?
21   A. No, it's the same thing.
22   Q. Okay.
23   A. It was just fun.
24   Q. All right. Did you have to tell them when you
25 come back after a two week break or do you have to tell

MIRARIS RUTH PAZ - March 19, 2010

Page 29

1  them you're going on vacation for two weeks and they
2  won't charge you or do they even know you've been gone
3  for two weeks?
4     A. I don't think they knew but the girls knew who
5  I was and who Cristina was.
6     Q. Right. But you don't have to start signing
7  paperwork again. You're under the -- as far as you were
8  concerned, under the same paperwork as when you started?
9     A. Well, they told me that I needed to sign the
10 paperwork all over again --
11    Q. All right.
12    A. -- because she had been out.
13    Q. Right.
14    A. And they never gave me the paperwork. Every
15 morning when I would drop off Cristina, I would ask
16 about the paperwork and either the girl was not there or
17 they just say just leave the check here and I'll give it
18 to --
19    Q. How were you paying?
20    A. -- them.
21       By check.
22    Q. By day, by check, by --
23    A. By week.
24    Q. By week.
25    A. Uh-huh.

Page 30

1     Q. Okay. So you paid for -- your checks would
2  also tell us --
3     A. Uh-huh.
4     Q. -- as well?
5     A. Yes.
6     Q. Okay. So the checks would tell us the first
7  period of time and you probably took her or paid for at
8  least a full week; you agree --
9     A. Yes.
10    Q. -- in all probability?
11       All right. How long was she there the
12 second time before she got hurt, approximately?
13    A. I believe it was two weeks, but I'm not sure.
14    Q. Again, we can look at the -- the last two-week
15 period that you were at the college place and go from
16 the end of that two-week period until August 8th and we
17 would know; correct?
18    A. Yes, sir.
19    Q. All right. As far as you were concerned, the
20 paperwork that you might have signed, would have signed,
21 could have signed, the second time would have been the
22 same participation agreement as you signed the first
23 time?
24    A. I was not --
25       MR. BROWN: Objection, speculation.

Page 31

1  BY MR. SHEINESS:
2     Q. Did they indicate it was any different than the
3  first paperwork?
4     A. I think they mentioned -- I don't know. I
5  don't remember.
6     Q. Hypothetically if you had been presented a
7  blank form, this same blank form at the beginning of the
8  second time, you would have signed it without
9  hesitation, wouldn't you?
10    A. Yes.
11    Q. Okay. So now she's there a second time, same
12 day care, same swimming around the pool almost every
13 day; correct?
14    A. Uh-huh.
15    Q. Is that a "yes"?
16    A. Yes.
17    Q. All right. Did she ever tell you anything
18 about the facilities that are bad. The water is dirty,
19 the bathrooms are dirty, anything like that that she
20 reported?
21    A. No. I would have seen it and I would have said
22 something.
23    Q. You would have said something.
24       And when you dropped her off each day,
25 where would you drop her off, out front?

Page 32

1     A. At the gym.
2     Q. Okay. And where would you pick her up each
3  day?
4     A. At the gym.
5     Q. So how would you have seen the facilities?
6     A. Or the -- I would walk -- I would get there
7  early and walk in the pool area -- not the pool, the
8  lockers.
9     Q. Did you ever use their facilities?
10    A. No.
11    Q. Did your husband?
12    A. No.
13    Q. Anybody that you know of?
14    A. I believe my step daughter joined.
15    Q. When did your step daughter join?
16    A. I have no idea.
17    Q. Before or after the incident?
18    A. I have no idea.
19    Q. And your step daughter's name is?
20    A. Cloe Paz.
21    Q. C-L-O-E?
22    A. P-A-Z.
23    Q. P-A-Z.
24       Okay. Have you talked -- after this --
25 where were you when you heard your daughter had gotten

MIRARIS RUTH PAZ - March 19, 2010

Page 33

1  hurt?
2     A. I was going home.
3     Q. From?
4     A. Work.
5     Q. Where were you working at time?
6     A. The Woman's Specialist of Houston.
7     Q. And what type of business is that?
8     A. OB/GYN practice.
9     Q. And what do you do there?
10    A. I'm a medical assistant.
11    Q. And do you have an RN or --
12    A. There is an RN there.
13    Q. Are you an RN?
14    A. No, I'm a medical assistant.
15    Q. Medical assistant.
16       Okay. How long have you been a medical
17 assistant?
18    A. 22 years.
19    Q. Always in the OB/GYN field?
20    A. Yes, sir.
21    Q. Okay. Who contacted you?
22    A. My husband.
23    Q. Okay. How did he know -- how was he contacted?
24    A. I believe -- well, he told me that he was at
25 the day care of Life Time Fitness and that they had

Page 34

1 contacted him regarding my -- Cristina falling or
2 hurting her knee and he asked me do you want me to take
3 her to Texas Children or see a doctor over there. And I
4 told him, no, go ahead and bring him to Texas Children.
5     Q. Had she called him or coincidentally he was
6 there to pick her up?
7     A. No, they called him.
8     Q. They called him?
9     A. They tried calling me numerous times but my
10 phone didn't work and I just had a bunch of missed
11 calls.
12    Q. Okay. Because I knew from the participation
13 agreement they are supposed to be calling you?
14    A. Right.
15    Q. And they had tried to called you?
16    A. They called. They tried.
17    Q. Okay. You don't have any complaint with my
18 client for not trying to contact you or your husband, do
19 you? Or, I mean, trying to reach you after the
20 incident?
21    A. Not -- no.
22    Q. Okay.
23    A. Regarding getting in touch with me?
24    Q. Yes.
25    A. No.

Page 35

1     Q. I mean, you might. I just don't -- I just want
2 to see where we were.
3       Okay. You told your husband to do what?
4     A. That I would meet him at Texas Children.
5     Q. Okay. Is that where you met at Texas Children?
6     A. Yes.
7     Q. Okay. Since that day till today, have you been
8 back to Life Time center?
9     A. Never.
10    Q. Have you sent anybody, your husband, lawyer,
11 investigator, friend, to do -- to go back to Life Time
12 center to check it out, take photographs, talk to
13 anybody, to your knowledge?
14    A. No.
15    Q. Have you communicated with anyone at Life Time
16 center past or present employee?
17    A. No.
18    Q. Has your husband, to your knowledge?
19    A. No.
20    Q. Have you visited any other Life Time center?
21    A. No.
22    Q. Has your husband, to your knowledge, or step
23 daughter or anyone else?
24    A. No.
25    Q. Has your step daughter provided you any

Page 36

1 information from whichever Life Time center she belongs
2 to --
3     A. No.
4     Q. Let me finish the question --
5     A. Oh.
6     Q. -- so we -- just to make sure.
7       About the facilities, about the
8 construction, design or anything like that?
9     A. No.
10    Q. The photographs that I showed your daughter,
11 have you seen those before today?
12    A. No.
13    Q. Okay. You're welcome to. I mean, I sent them
14 to your lawyer, but you have not seen them?
15    A. No, I just saw them now.
16    Q. Okay. Have you seen the incident report
17 prepared by my client right after the incident?
18    A. No.
19    Q. Okay. Tell me -- the records I have show that
20 -- at Texas Childrens the -- who was there to give the
21 history to the staff there, do you know?
22    A. My husband and I.
23    Q. Where did you get the history at that point in
24 time to tell them?
25    A. From my husband.

**MIRARIS RUTH PAZ - March 19, 2010**

Page 37

1  Q. Where had he gotten it from?
2  A. **The lifeguards that were there.**
3  Q. Okay. I'll ask him about it.
4      As I discussed with your daughter, the
5  medical records that I have show that she goes from --
6  well, one entry that I see dated October '08 -- October
7  of '08 from the school district.
8  A. Uh-huh.
9  Q. Patient done well in the past nine weeks. We
10 are so glad to see her walking getting around so well.
11 Her reading level is 14. She will be need to be at a 28
12 at the end of the second grade. She enjoys school and
13 learning and this help. Her math skills are where they
14 need to be now and we will be building on these.
15     Do you recall that first period reporting?
16 A. **I don't recall it.**
17 Q. Does it sound correct? And that would be as of
18 October of '08.
19     Would that be your description as well of
20 her -- as her -- of her at that time?
21 A. **I don't -- I don't recall it.**
22 Q. Okay. Same month, October of '08. Strike
23 that.
24     Two months later, December of '08, from
25 Dr. Brock: Patient continues to look great. Limping

Page 38

1  just a little bit, but so far so good. She's no longer
2  having any pain. Follow-up in six months with an x-ray.
3      Do you recall being told that in December
4  of '08 by Dr. Brock?
5  A. **I don't recall it.**
6  Q. Okay. And then on that same time he notes:
7  Return to school. Was in the office today. He -- has
8  now recovered sufficiently to be able to return to
9  activities.
10     Do you recall that from Dr. Brock advising
11 you of that on December 2nd, 2008?
12 A. **I don't recall it.**
13 Q. I go in the records that I've obtained from
14 December of '08. The next medical record I have is May
15 12th of '09.
16     Does that sound correct to you?
17 A. **December '08 --**
18 Q. To May 12.
19 A. **I remember May. I remember May. I don't
20 remember --**
21 Q. Do you remember her seeing any doctor between
22 December 2nd, 2008 and May 12th, 2009?
23 A. **It would be only Dr. Brock.**
24 Q. Okay. And if his records show a break --
25 A. **If it's -- right.**

Page 39

1  Q. -- show a break.
2      Okay. The records show on May 12 or his
3  records show patient went to the beach and played and
4  jumped all day Saturday. On Saturday night she woke up
5  with a lot of pain in the leg.
6      Is that the history you gave to Dr. Brock?
7  A. **Yes.**
8  Q. He also -- she -- Dr. Brock notes she does not
9  feel pain, but she is scared.
10     Do you recall that?
11 A. **No.**
12 Q. On May -- that same May 12, '09, it says:
13 Patient was playing at the beach on May 10 where she was
14 jumping up and down all day and riding a bicycle in a
15 standing position.
16     Did you give him that history?
17 A. **No.**
18 Q. Who would have given a history to Dr. Brock
19 other than you?
20 A. **I don't know, but she was not riding a bike.**
21 Q. Okay. Who was at the beach as she described
22 you and --
23 A. **A friend of mine, Cristina and I. It was for
24 Mother's Day.**
25 Q. And you all three were the only ones?

Page 40

1  A. **Yes.**
2  Q. And what's the name of the friend?
3  A. **Becky McKay.**
4  Q. Okay. And how would you reach Becky McKay if I
5  wanted to talk to Becky McKay?
6  A. **I can give you her number.**
7      MR. SHEINESS: And I request her number.
8  BY MR. SHEINESS:
9  Q. We go from May 12 to May 25th of '09. And the
10 office visit history from Dr. Brock says it bothers her
11 sometimes once a week and sometimes not at all.
12 Recently the family had a really active day and while
13 they were visiting their grandmother in the nursing
14 home, Cristina started complaining of a lot of pain in
15 the knee and that night it was even worse.
16     Do you recall that?
17 A. **Yes.**
18 Q. Was there anything particularly going on at the
19 nursing home activitywise?
20 A. **She was just -- it was before we got to the
21 nursing home. She had just been running around, nothing
22 -- just running. Anytime that she would -- this
23 happened twice. Anytime that she would overdo herself,
24 she would complain of severe pain and it would just kick
25 on.**

**MIRARIS RUTH PAZ - March 19, 2010**

Page 41

1  Q. How long would it last?
2  A. Two days. About two days.
3  Q. Would Advil and Motrin seem to help or not?
4  A. No, it wouldn't help.
5  Q. What is an "S" and an "E" at Oyster Creek
6  Elementary? I need to ask you that, although I don't
7  have children.
8  A. Satisfactory or excellent.
9  Q. She got three S's and one E.
10    Is that good?
11  A. Uh-huh. That's good, yeah.
12  Q. I got all F's so I...
13    When the doctor writes or Texas Children
14  writes on October 22, '09 not experiencing any pain now,
15  is that -- is it your understanding because that's that
16  day or is that just generally that period of time?
17  A. That day. What day was that?
18  Q. October 22nd, 2009 Texas Childrens Hospital.
19  A. Texas Children Hospital?
20  Q. Right. TCH.
21  A. No, that would be Dr. Brock's office.
22  Q. Or is that Dr. Antekeier?
23  A. Antekeier.
24  Q. Antekeier.
25  A. At that time. She was --

Page 42

1  Q. And that was -- right.
2    You mean that at that time that day --
3  A. That day.
4  Q. -- or that general area of days?
5  A. That day.
6  Q. It says there, not pain is not while you're
7  visiting the clinic.
8    Is that because you were going for a second
9  opinion?
10  A. Second opinion.
11  Q. Okay. She still playing with video games?
12  A. Yes.
13  Q. All right. And Dr. David Antekeier in his
14  plan, do you recall reading his plan or telling you what
15  his plan was?
16  A. Basically he agreed with Dr. Brock's diagnosis
17  and to do the surgery.
18  Q. It says I would like for her to return to all
19  levels of activities. I have discussed the importance
20  of stretching it and at her age she may have a condition
21  that could requires maybe both Motrin and ice after
22  activities. Did he discuss that with you?
23    Particularly stretching would be important
24  before activities. Did he discuss that with you?
25  A. I don't remember.

Page 43

1  Q. Okay. I also discussed watching her weight so
2  she does not overload her knees.
3    Do you recall him talking to you about
4  that?
5  A. Yes.
6  Q. Okay. And then Dr. Brock did the procedure;
7  correct?
8  A. Yes.
9  Q. Okay. Was it that day or was she an overnight?
10  A. It was an overnight.
11  Q. How many nights did she stay?
12  A. She stayed -- one night she stayed over one
13  night because of the pain.
14  Q. Okay. It says it was a day surgery unit is
15  where it took place?
16  A. Uh-huh.
17  Q. That's the reason I asked.
18  A. Yes.
19  Q. But she stayed over another night?
20  A. She stayed a night because the incision was
21  larger than they had to do and --
22  Q. Okay.
23  A. -- they put a pump -- a pain pump overnight.
24  Q. Okay. That would have been in October of --
25  November of '09; correct?

Page 44

1  A. Yes.
2  Q. And she returned to school on November 16th of
3  '09?
4  A. Yes, sir.
5  Q. Has she missed any time from work or --
6  A. From school.
7  Q. -- from school?
8  A. Right. I'm sorry.
9  Q. It's a long day and it's Friday.
10    She did not fall behind, did she?
11  A. Yes.
12  Q. How far behind did she fall? Has she made it
13  up or not?
14  A. She's made it up now.
15  Q. Okay. And -- okay. Let me see that.
16    MR. SHEINESS: I still want a copy, but
17  it's in here, too.
18  BY MR. SHEINESS:
19  Q. You must have switched over in November of '09
20  because now they switch over to Aetna.
21  A. Probably.
22  Q. Okay. When did you buy the pedals for her at
23  the home, do you know?
24  A. We didn't buy them. My mother-in-law give them
25  to us.

MIRARIS RUTH PAZ - March 19, 2010

Page 45

1  Q. Okay. When was that?
2  A. I don't recall.
3  Q. The notation from Dr. Brock which I think is
4  the last time he saw her, correct, November 17th of '09?
5  A. Yes, sir.
6  Q. Says x-rays looked good. She is very
7  comfortable and is already putting weight on the leg
8  without pain. She may increase her weight bearing as
9  tolerated. We'll see her back in two weeks to check
10 motion and strength in her leg but no further x-rays
11 will be necessary.
12         Assuming I have that down correct, you have
13 not returned, though?
14 A. No, he have not.
15 Q. Okay. Whatever you know about the incident,
16 have you -- is second or third hand or have you talked
17 to someone who witnessed the incident besides talking to
18 your daughter, of course?
19 A. Besides talking to my daughter?
20 Q. Right.
21 A. My husband.
22 Q. Okay. He did not witness it, did he?
23 A. No.
24 Q. Okay. You heard her description of what she
25 was doing at the time.

Page 46

1  Is that consistent, little consistent,
2  inconsistent with what she's told you immediately
3  afterwards how it occurred?
4  A. Consistent.
5  Q. Okay. Do you understand what your daughter and
6  I were talking about how there's a drop and a lip that
7  these things all sit on?
8         Do you understand what we were talking
9  about?
10 A. No.
11 Q. Seeing this photograph that your daughter was
12 using, holding up, you have the grates that run the
13 entire parameter. They're about three feet long, about
14 four or five inches wide.
15        Do you see what I'm talking about? And you
16 see how they are flush?
17 A. Uh-huh.
18 Q. Is that a "yes"?
19 A. Yes.
20 Q. Okay. And assuming they rest on the length
21 sides, they're butting, there is one, two, three. There
22 is one, two -- there is three. And there's a lip that
23 these are all are laying on.
24 A. Yes, sir.
25 Q. I'm trying to think of something around your

Page 47

1  house that you might be familiar with. Can you think of
2  anything that you're familiar with that rests on
3  something like that?
4         MR. BROWN: Objection.
5  BY MR. SHEINESS:
6  Q. At your house?
7         How about out front of your house, have you
8  ever gone out there to see what your water sprinkler or
9  your water supply box looks like?
10 A. No.
11 Q. Okay. Have you done any investigation or your
12 husband or anyone else other than your lawyer on the
13 internet, dealing with other accidents or incidents with
14 this type of grating system?
15 A. No.
16 Q. I'll take all that back.
17 A. (Tendering).
18 Q. You don't have any -- again, you don't have any
19 idea what the deductible was on either policy?
20 A. I sure don't.
21 Q. Did you meet the deductible on both policies,
22 though?
23 A. I don't know.
24        MR. SHEINESS: Okay. That's all the
25 questions that I have. Thank you, ma'am.

Page 48

1         THE WITNESS: Thank you.
2         MR. BROWN: We will reserve our questions
3  for trial.
4         VIDEOGRAPHER: We're off the record. The
5  time is 2:30 p.m.
6
7         (DEPOSITION CONCLUDED AT 2:30 P.M.)

MIRARIS RUTH PAZ - March 19, 2010

Page 49

```
 1         CHANGES AND SIGNATURE
 2  WITNESS NAME:  MIRARIS RUTH PAZ
 3  DATE OF DEPOSITION:  MARCH 19, 2010
 4  PAGE      LINE      CHANGE
 5  REASON
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 50

```
 1     I, MIRARIS RUTH PAZ, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
 6            _____
              MIRARIS RUTH PAZ
 7
 8  THE STATE OF TEXAS:
 9  COUNTY OF HARRIS:
10
11     BEFORE ME, _____, on this day
12  personally appeared MIRARIS RUTH PAZ, known to me to be
13  the person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they executed the
15  same for the purposes and consideration therein
16  expressed.
17
18     Given under my hand and seal of office this
19  _____ day of _____, 2010.
20
21
            _____
22          NOTARY PUBLIC IN AND FOR
            THE STATE OF TEXAS
23
    My commission expires:_____
24
    ____ No Changes Made   ____ Amendment Sheet(s) Attached
25
```

Page 51

```
 1     IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
 2           HOUSTON DIVISION
 3  PABLO PAZ, INDIVIDUALLY   )
    AND A/N/F MIRARIS RUTH    )
 4  PAZ, A MINOR, AND RUTH    )
    PAZ,                      )
 5                            ) CIVIL ACTION
    VS.                       )
 6                            ) NO.: 4:09-CV-2804
                              )
 7  LIFE TIME FITNESS, INC.,  )
    LTF CMBS 1, LLC, LTF CLUB )
 8  MANAGEMENT COMPANY, LLC,  )
    LTF CLUB OPERATIONS       )
 9  COMPANY, INC. And GENE    )
    SMITH                     )
10
11
12      REPORTER'S CERTIFICATION OF THE ORAL
13        DEPOSITION OF MIRARIS RUTH PAZ
14              MARCH 19, 2010
15
16     I, Kevin J. Bruzewski, Certified Shorthand Reporter
17  in and for the State of Texas, hereby certify to the
18  following:
19     That the witness, MIRARIS RUTH PAZ, was duly sworn
20  by the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by
22  the witness;
23     That the original deposition was delivered to
24  _____.
25     That a copy of this certificate was served on all
```

Page 52

```
 1  parties and/or the witness shown herein on
 2  _____.
 3     I further certify that pursuant to FRCP Rule
 4  30(f)(1) that the signature of the deponent:
 5  _____ was requested by the deponent or a party
 6  before the completion of the deposition and that the
 7  signature is to be before any notary public and returned
 8  within 30 days from date of receipt of the transcript.
 9  If returned, the attached Changes and Signature Page
10  contains any changes and the reasons therefore:
11  _____ was not requested by the deponent or a party
12  before the completion of the deposition.
13     I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
15  attorneys in the action in which this proceeding was
16  taken, and further that I am not financially or
17  otherwise interested in the outcome of the action.
18     Certified to by me on this, the _____ day of
19  _____, 2010.
20
21            -KJBujh-
                  Digitally signed by Kevin Bruzewski
22            _____
              Date: 2010.03.25 13:07:23 -07:00
              Reason: I am the author of this document
              Location: Houston, TX
              Kevin J. Bruzewski, CSR
23            Certification No. 3727
              Expires:  December 31, 2011
24  Firm ID No. 578
    1225 North Loop West, Suite 327
25  Houston, Texas 77008
    713.626.2629
```

RESOURCE REPORTING SERVICE
(713) 626-2629

5687e685-2667-4939-ab99-38f481cafa62

MIRARIS RUTH PAZ - March 19, 2010

```
                                              Page 53
 1  COUNTY OF HARRIS:
 2  STATE OF TEXAS:
 3      I hereby certify that the witness was notified on
 4  _____ that the witness has 30 days or
 5  (____ days per agreement of counsel) after being
 6  notified by the officer that the transcript is available
 7  for review by the witness and if there are changes in
 8  the form or substance to be made, then the witness shall
 9  sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11      That the witness' signature was/was not returned as
12  of _____.
13      Subscribed and sworn to on this, the _____ day of
14  _____, 2010.
15
16
17
18      _____
            Kevin J. Bruzewski, CSR
19          Certification No. 3727
            Expires:  December 31, 2011
20
    Firm ID No. 578
21  1225 North Loop West, Suite 327
    Houston, Texas  77008
22  713.626.2629
23
24
25
```